ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

MAR – 7 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>JOHN CHARLIE GARCIA | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>18 MJ 00523 |

Complaint for violation of Title 21, United States Code, Section 841(a)(1),(b)(1)(B)(ii): Possession with Intent to Distribute Cocaine

| NAME OF MAGISTRATE JUDGE<br>HONORABLE MICHAEL R. WILNER   R.A. OLIVER | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>March 6, 2018 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)]

On or about March 6, 2018, in Los Angeles County, within the Central District of California, defendant JOHN CHARLIE GARCIA knowingly possessed with intent to distribute at least 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule I controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:  (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>NORMAN TOBIAS |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, DEA |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>ROZELLA A. OLIVER | DATE<br>March 7, 2018 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA: SHAWN T. ANDREWS x6104          REC: DETENTION

### **AFFIDAVIT**

I, Norman Tobias, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint against John Charlie GARCIA ("GARCIA") for a violation of Title 21, United States Code, Section 841(a)(1): Possession with Intent to Distribute Cocaine.

2.   This affidavit is also made in support of an application for a search warrant to search a white Apple iPhone seized from GARCIA on March 6, 2018 and currently in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California (the "SUBJECT DEVICE"). The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICE that constitutes evidence or fruits of violations of Title 21, United States Code Section 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances) (the "Subject Offenses"), or the SUBJECT DEVICE if it is itself an instrumentality of the Subject Offenses.

3.   The SUBJECT DEVICE is further described in Attachment A to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF DEA SPECIAL AGENT NORMAN TOBIAS

5.   I am a sworn Special Agent (SA) of the United States DEA and am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and to make arrests for, among other offenses, drug offenses enumerated in Title 21 of the United States Code.

6.   I have been a SA for the United States Drug Enforcement DEA since 1996.  Prior to employment with the DEA, I was a Border Patrol Agent for the United States Border Patrol from August 1994 until July 1996.  Since my employment with the DEA, I have been involved in over 1000 drug related investigations and have personally arrested more than 250 drug related offenders.  During my time as a SA, I have worked and conferred with experienced agents/officers in drug law enforcement and have drawn from their knowledge and experience in the field of drug law enforcement.

2

7.    I am currently assigned to the DEA Narcotics Task Force
(NTF) at the Los Angeles International Airport ("LAX").  The
LAXNTF is an inter-agency task force that consists of DEA SAs and
Sergeants, Detectives and Officers from the following agencies:
the Los Angeles World Airports Police Department ("LAWAPD"), the
Los Angeles Police Department ("LAPD"), and the Los Angeles
County Sheriff's Department ("LASD").  The DEA LAXNTF also works
closely with the United States Customs and Border Protection
("CBP"), the Transportation Security Administration ("TSA"), the
Department of Homeland Security ("DHS") and the Federal Bureau of
Investigation ("FBI").  All of the aforementioned agencies
recognize the need for a coordinated law enforcement effort to
target airport/airline internal criminal enterprises that use the
aviation system to transport large amounts of illicit drugs
throughout the United States, and throughout the world.

8.    Specifically, the DEA LAXNTF is focused on investigating
airport/airline internal conspiracies in which criminal
enterprises recruit airport/airline employees to exploit their
privileged airport access and knowledge of existing airport
security procedures, as well as airline passengers smuggling
drugs and drug proceeds through the airport.  Previous and
current investigations have identified Transnational Criminal
Organizations ("TCO's") that rely generally on drug trafficking
as their primary source of revenue.  As such, TCO's require the
use of various forms of transport in order to obtain and
distribute large amounts of illicit drugs into and through the

3

United States, and air travel provides a significant opportunity for them to do so.  Additionally, air travel provides an opportunity to smuggle and distribute other contraband, to include drug proceeds.

9.   While working as a SA, I have participated in numerous investigations into the unlawful importation, possession with intent to distribute, and distribution of controlled substances, as well as the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities and conspiracies associated with criminal drug offenses.  In conducting these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources.  Through these investigations, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by drug traffickers to smuggle and safeguard drugs, to distribute drugs, and to collect and launder related drug proceeds.  I am familiar with methods employed by large drug trafficking organizations ("DTOs") and the sophisticated tactics they routinely use to attempt to thwart investigation of their narcotics organizations.  My knowledge of these tactics, which includes the utilization of couriers, debit calling cards, public telephones, cellular telephone technology, beepers, counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious

4

identities, and coded communications and conversations, has been particularly useful and relevant to this particular investigation.

10. Based on my training and experience, I am familiar with the methods of operation of drug traffickers, including the importation, exportation, distribution, transportation, and storage of controlled substances, as well as the collection of money proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds. I am also familiar with the methods of operation used by people who distribute controlled substances, including the distribution, storage and transportation of controlled substances, as well as the collection of proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds.

### III. SUMMARY OF PROBABLE CAUSE

11. On March 6, 2018, 2018, TSA screeners found five approximately one kilogram-sized packages of suspected drugs concealed in GARCIA's checked suitcase at LAX. Three of the packages were wrapped in translucent material and were white in color and the other two packages were wrapped in a silver wrapping material. Officers field-tested the substance inside one of the white packages that weighed approximately one kilogram and obtained a positive result for cocaine. GARCIA was arrested before he boarded his flight, and, in a Mirandized interview, admitted that he transported drugs.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, as well as my own observations and knowledge of the investigation, I am aware of the following:

**A.    The Discovery of the Drugs by TSA in GARCIA's Checked Bag**

13. On March 6, 2018, at approximately 7:00 a.m., TSA Officer TSO Douglas Recinos, while working CTX Machine #4 in the LAX Terminal 3 baggage screening room, received an alarm from the machine. TSO Recinos' assignment is to conduct security checks and searches on outbound checked luggage. TSO Recinos removed the suitcase from the machine and conducted a physical search of the bag to clear the alarm. During the search, TSO Recinos discovered a pair of blue jeans inside the suitcase with five vacuum-sealed containers of a white substance concealed inside the pant legs of the jeans. TSO Recinos then called his supervisor, Michelle Romero, who subsequently called the LAX police department (LAXPD). LAXPD Officer Lisa Lane responded to the scene and saw the suspected contraband. Based on her training and experience, Officer Lane suspected the contraband to be drugs and then called for additional LAXPD officers and a supervisor. The suspect suitcase bore bag tag #8006790987 in the name of John Charlie GARCIA.

14. LAXPD Officers BG Davis and L. Swindell subsequently arrived on scene, obtained information on GARCIA and proceeded to Terminal 3, Gate 31, in order to locate GARCIA. Officers Davis & Swindell subsequently located GARCIA, who was attempting to board

6

Delta flight #1631 to Washington, D.C., and took him into custody without incident.

15.   Shortly thereafter, DEA LAXNTF member Detective Claudio Cruz arrived on scene.  Detective Cruz took custody of the suspected drugs and, along with Officers Davis & Swindell, transported GARCIA and the suspected drugs to the DEA LAXNTF office to continue the investigation.

**B.   Presumptive Positive Test for Cocaine**

16. At the DEA LAXNTF office, TFO Marlon Coronado and I took custody of GARCIA and the suspected drugs. Additionally, we took custody of GARCIA's mobile phone, a white color Apple iPhone, the SUBJECT DEVICE.

17. The suspected drugs were in the form of five individually vacuum-sealed kilogram-sized bricks.  Three of the bricks had a similar white color while the other two bricks had more of a silver color.  TFO Coronado conducted a TruNarc field test of one of the white-colored bricks which came back positive for the presence of cocaine.  The white-colored brick that TFO Coronado tested weighed approximately one kilogram.  The other white-colored bricks were similar in appearance to the brick TFO Coronado tested.  Based on my training and experience, I know that drug traffickers transporting multiple packages of drugs will package each type of drug in similar packaging. Accordingly, I believe that all the white-colored packages contain cocaine.

18.   The two silver color bricks required a much larger intervention to expose the material within the packaging as they appeared to have been encased in an additional layer of grey duct tape.  Due to the frequency of potentially life-threatening synthetic opioids (including fentanyl) being smuggled through LAX, TFO Coronado deemed it too risky to open either of the silver color bricks to conduct a TruNarc presumptive test.

19. The decision not to conduct such a test is due to the significant threat to law enforcement personnel, first responders, and members of the public by Fentanyl, Fentanyl-related substances, synthetic opioids, and other powders which may be composed in full, or in part, of one of these aforementioned substances.  Only trained personnel, in a lab or comparable secure environment, with necessary personal protective equipment, should be conducting such tests, and they should be conducted in a controlled, safe environment.  Conducting tests in an uncontrolled environment, and without proper protective equipment, poses an undue risk and could result in serious bodily injury or death to those unknowingly exposed to fentanyl, fentanyl-related substances, or synthetic opioids.

**C.   GARCIA's Admission Post-Miranda**

20.   I read GARCIA his <u>Miranda</u> rights, as witnessed by TFO Coronado, and GARCIA agreed to provide a statement.  GARCIA told us the following, in substance and summary:

a.   GARCIA admitted he has worked as a courier for a male Hispanic known only as "Caflutes" on numerous (at least five)

occasions, each time earning $1,500 for transporting bulk
currency.  Each time, GARCIA meets with "Caflutes" prior to the
trip to receive cash to buy his ticket.  GARCIA then deposits the
cash in his debit credit card account and then purchases his plane
ticket. "Caflutes" will regularly call GARCIA, from various
telephone numbers, on the SUBJECT DEVICE to determine GARCIA's
status when he is working as a courier for "Caflutes".

     b.   GARCIA stated that on this occasion, he was
traveling with cocaine and was going to be paid an additional
$1,000 for each kilogram brick he was transporting, on top of his
usual $1,500 courier payment.  "Caflutes" told GARCIA the bricks
were cocaine and that when GARCIA landed in Washington, D.C., he
was supposed to get a hotel room and then call "Caflutes" for
further instructions.

     c.   When asked for consent to search the SUBJECT
DEVICE, GARCIA became apprehensive and ultimately stated he
thought he should speak with an attorney.  At this point, the
post-arrest interview was concluded.

    21. The three white packages suspected to all contain
cocaine have a gross weight of approximately 3.26 kilograms
(including the packaging materials).  The two silver packages
suspected to contain fentanyl or another controlled substance
have a gross weight of approximately 2.32 kilograms (including
the packaging materials). After all five bricks were processed as
evidence, they were transported to the DEA Southwest Regional
Laboratory for further testing and analysis.

## V.  TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

22. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

23. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

24. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

25. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital

devices, including in the form of calendar entries and location data.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

26. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

   c. The SUBJECT DEVICE could have up to 16,000 megabytes of storage.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

   d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[1] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space

---

  [1] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what

tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

     g.   Digital device users can attempt to conceal data
within digital devices through a number of methods, including the
use of innocuous or misleading filenames and extensions. For
example, files with the extension ".jpg" often are image files;
however, a user can easily change the extension to ".txt" to
conceal the image and make it appear that the file contains text.
Digital device users can also attempt to conceal data by using
encryption, which means that a password or device, such as a
"dongle" or "keycard," is necessary to decrypt the data into
readable form.   In addition, digital device users can conceal data
within another seemingly unrelated and innocuous file in a process
called "steganography." For example, by using steganography a
digital device user can conceal text in an image file that cannot
be viewed when the image file is opened.   Digital devices may also
contain "booby traps" that destroy or alter data if certain
procedures are not scrupulously followed.   A substantial amount of
time is necessary to extract and sort through data that is
concealed, encrypted, or subject to booby traps, to determine
whether it is evidence, contraband or instrumentalities of a
crime.   In addition, decryption of devices and data stored thereon
is a constantly evolving field, and law enforcement agencies
continuously develop or acquire new methods of decryption, even
for devices or data that cannot currently be decrypted.

    27. I believe that the SUBJECT DEVICE may use GARCIA's
biometric features to unlock the SUBJECT DEVICE (in addition to

also allowing the device to be unlocked with an alphanumeric passcode).

a.   I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard. Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later),

iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro
laptops with the Touch Bar are all equipped with Touch ID.

      c.   The SUBJECT DEVICE is an Apple iPhone. Such devices
may be equipped with a facial-recognition feature, and a user may
enable the ability to unlock the device through his or her face.
To activate the facial-recognition feature, a user must hold the
device in front of his or her face.  The device's camera analyzes
and records data based on the user's facial characteristics.  The
device is then automatically unlocked if the camera detects a face
with characteristics that match those of the registered face.  No
physical contact by the user with the digital device is necessary
for the unlock, but eye contact with the camera is often essential
to the proper functioning of these facial-recognition features;
thus, a user must have his or her eyes open during the biometric
scan (unless the user previously disabled this requirement).
Several companies produce digital devices equipped with a facial-
recognition-unlock feature, and all work in a similar manner with
different degrees of sophistication, e.g., Samsung's Galaxy S8
(released Spring 2017) and Note8 (released Fall 2017), Apple's
iPhone X (released Fall 2017).  Apple calls its facial-recognition
unlock feature "Face ID."  The scan and unlock process for Face ID
is almost instantaneous, occurring in approximately one second.

      d.   While not as prolific on digital devices as
fingerprint- and facial-recognition features, both iris- and
retina-scanning features exist for securing devices/data.  The
human iris, like a fingerprint, contains complex patterns that are

17

unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye.

28.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

29.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled.  This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time.  For example, with Apple's biometric unlock features, these circumstances include when: (1) more than

48 hours has passed since the last time the device was unlocked;
(2) the device has not been unlocked via Touch ID or Face ID in
eight hours and the passcode or password has not been entered in
the last six days; (3) the device has been turned off or
restarted; (4) the device has received a remote lock command; (5)
five unsuccessful attempts to unlock the device via Touch ID or
Face ID are made; or (6) the user has activated "SOS" mode by
rapidly clicking the right side button five times or pressing and
holding both the side button and either volume button.  Biometric
features from other brands carry similar restrictions.  Thus, in
the event law enforcement personnel encounter a locked device
equipped with biometric features, the opportunity to unlock the
device through a biometric feature may exist for only a short
time. I do not know the passcode of the SUBJECT DEVICE.

    30. For these reasons, if while executing the warrant, law
enforcement personnel discover that the SUBJECT DEVICE must be
unlocked using one of the aforementioned biometric features, the
warrant I am applying for would permit law enforcement personnel
to, with respect to GARCIA who was in possession of the SUBJECT
DEVICE and who is reasonably believed by law enforcement to be a
user of a biometric sensor-enabled device: (1) compel the use of
GARCIA's thumb- and/or fingerprints on the SUBJECT DEVICE; and
(2) hold the device in front of the face of GARCIA's face with
his eyes open to activate the facial-, iris-, and/or retina-
recognition feature. With respect to fingerprint sensor-enabled
devices, although I do not know which of the fingers are

authorized to access any given device, I know based on my
training and experience that it is common for people to use one
of their thumbs or index fingers for fingerprint sensors; and, in
any event, all that would result from successive failed attempts
is the requirement to use the authorized passcode or password.

31. Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII. **CONCLUSION**

32. For all of the reasons described above, there is
probable cause to believe that GARCIA has committed a violation
21 U.S.C. § 841(a) (possession with intent to distribute
methamphetamine). Also, for all the reasons described above,
there is probable cause to believe that the items described in
Attachment B are evidence, fruits, and instrumentalities of the
offenses described in Attachment B, and will be found in the
digital device described in Attachment A.


_____
Norman Tobias,
DEA Special Agent


Subscribed to and sworn before me
this 7th day of March, 2018.


_____
UNITED STATES MAGISTRATE JUDGE
MICHAEL R. WILNER  R A Oliver

20